IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GIBBS V. GIBBS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ELIZABETH A. GIBBS, APPELLEE,

V.

DONALD W. GIBBS, APPELLANT.

Filed July 3, 2018.    No. A-17-681.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge.
Affirmed.

Michael S. Kennedy, of Kennedy Law Firm, P.C., L.L.O., for appellant.

Ralph E. Peppard for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

The Douglas County District Court dissolved the marriage between Elizabeth A. Gibbs and Donald W. Gibbs. A decree, as amended, was entered from which Donald has appealed and assigned numerous errors related to alimony, property, child custody, school-related expenses for the minor child, and attorney fees. We affirm.

BACKGROUND

Elizabeth and Donald were married in Chicago, Illinois, on November 11, 1989. Elizabeth, who had a bachelor's and a master's degree in nursing, was working as a clinical nurse at the time. Donald, who had a bachelor's degree in philosophy and a bachelor's degree in political science, was teaching. Three children were born of the marriage; however, only one child was still a minor at the time of divorce, namely, Emma Gibbs (born 2001). Elizabeth filed for dissolution of the

- 1 -

marriage in February 2015. In May, a temporary order was entered which awarded the parties joint legal custody of Emma, with physical custody awarded to Elizabeth. Donald was not ordered to pay child support due to his "'underemployment'"; Elizabeth was ordered to pay temporary alimony of $1,100 per month (modified in June 2016 to $800 per month). The family residence was ordered to be readied and listed for sale, and Elizabeth was given sole use and possession of the home in the meantime. Each party was ordered to pay for certain obligations, and the order restrained the parties from removing, selling, transferring, auctioning, or otherwise disposing of any mutual property located in the residence, except for necessities of life. Donald was ordered to provide an accounting of the $15,000 he had removed from the parties' line of credit. The parties were also ordered to not disturb each other's peace during the pendency of the action.

Trial took place on September 20 and December 15, 2016, and a decree was entered on February 7, 2017. Following a hearing on Donald's motion for new trial and motion to alter or amend judgment, the decree was amended on June 5. Elizabeth was awarded legal and physical custody of Emma, and Donald was ordered to pay child support of $332 per month. The evidence pertaining to the parties' assets and liabilities and other issues raised by Donald on appeal will be addressed as necessary in our discussion below. Donald timely appeals from the district court's June 5, 2017, order granting his motion to alter or amend in part, and denying his motion for new trial.

## ASSIGNMENTS OF ERROR

Donald assigns, consolidated and restated, that the district court erred by (1) failing to award him alimony, (2) failing to credit his contributions to marital debt, (3) reducing his one-half share of the marital retirement accounts by wrongly making him responsible for one-half of the marital debt, (4) not abiding by its temporary order regarding repairs done to the marital home in preparation for its sale and the transfer of marital property to the new homeowners, (5) failing to order an equal split of marital money kept in a federal credit union account, (6) not awarding him attorney fees, (7) ordering him to pay a portion of the minor child's expenses on top of child support, and (8) granting sole legal custody of the minor child to Elizabeth.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

ANALYSIS

ALIMONY

In addressing whether to award alimony to Donald, the district court's decree states:

The Court finds that [Donald] chose to quit his profession as a teacher. That the moving of the family during the marriage was at the insistence of [Donald] and did not contribute to [Elizabeth's] career but was a detriment to her career. After the last two moves, [Elizabeth] was required to start anew as a nurse in an entry position. That the parties equally contributed to the care and education of the children. That [Donald] did not forego any employment opportunities in order to care for the children. That the children went to daycare while [Donald] worked from home on his business when the children were young. No child will be affected by [Donald] returning to full time gainful employment. [Elizabeth] has paid alimony in the temporary order. During this time, [Donald] has completed the necessary steps to obtain his teaching recertification. That given the general equities of this situation, alimony is not awarded.

Donald, age 58 at the time of trial, claims the district court's decree "guarantees homelessness for [him] in his retirement years and life on the edge of poverty in the years prior to retirement." Brief for appellant at 16. He claims Elizabeth has more than $3,600 "left over each month in disposable income" and "clearly has more than enough income to pay [him] at least $1,200 per month in alimony for ten years." *Id*. at 35-36.

There is no question that a disparity in the income of the parties exists. Elizabeth is a director of a department at "CHI Health"; the child support worksheet attached to the decree shows her with a monthly net income of approximately $6,100, with Donald's monthly net income at approximately $1,500. We would note that the worksheet adopted by the district court is the one offered by Donald at trial, and he testified that the income figure used for Elizabeth was his estimation of her income, including recent raises, and monthly income from her annuities. Notably, the $429 per month Elizabeth receives from annuities are derived from her inheritance and would be nonmarital. Regardless, a disparity in income exists.

Clearly, Donald has a greater earning capacity than he has in actual earnings over the more recent years. Donald has a bachelor's degree in philosophy and a bachelor's degree in political science. He was also in graduate school at Loyola University-Chicago from 1990 to 1992, but did not "quite complete a masters of social work." According to Donald, he was a class and internship shy of finishing. He was terminated from his internship "because I was a whistleblower on a school faculty member. And my prize for being honest, truthful, and a whistleblower was that they axed me out of that internship."

Donald started teaching in 1986, and was doing so when the parties were married in November 1991 in Chicago. Elizabeth has a bachelor's and a master's degree in nursing, and was employed as a clinical nurse at Loyola University Medical Center in Chicago from 1989 to 1993. Since Donald wanted to move to Omaha, Nebraska, to be closer to family, and because he felt Chicago was not a great place to raise the children, they moved to Omaha in September 1993. Elizabeth had to "start over at a job" in Omaha, and Donald worked as a substitute teacher during the fall semester of 1993, and then he "changed careers into sales." According to Elizabeth, the

family then moved to Florida in June 2004 because Donald "didn't like the weather in Omaha." This move caused Elizabeth to "go back to the hospital setting" in Florida; there "were no jobs with a master's degree, so I had to take a job at the hospital working nights." "[I]t was a backwards move." After a year in Florida, the family moved back to Omaha because the girls missed their friends in Nebraska. Elizabeth again had to start over and find a different job. She has worked with CHI Health (previously Alegent) since 2005.

After making his career change from teaching, Donald has had a "promotional products business" for over 22 years. He testified that business was good initially in the 1990s, with "very close to [$45,000-$50,000] net profit." But the last several years have been "[t]errible." According to Donald, business has been poor, "so that's why I'm heading back into teaching." In more recent years, the parties' income tax returns show losses from Donald's business, and Donald anticipated that for 2015, "It'll be a loss. No doubt about it."

After Elizabeth filed for divorce in February 2015, Donald enrolled in classes at the University of Nebraska at Omaha in order to get his teaching license recertified. He took two classes in the summer of 2015, two classes in the fall, and one class in the spring of 2016 (total of 15 credit hours). Elizabeth was paying $1,100 per month in temporary alimony to Donald during this time. Donald sees his age as being a challenge to securing employment, as well as the number of years he has been away from the classroom. After receiving his certification in June 2016, Donald testified that he reached out to 25 to 30 school districts for jobs, but given the time of year (September), there were not many positions available because "[s]chools are going to be hiring in January, February, by the end of March schools are really going to be set." Donald testified, "My chances are going to go much higher now that I'm done, you know, as I look at the [2017-18] school year."

In the meantime, he applied to work as a substitute teacher at various school districts (where he can earn $140 per day), and was doing some sports officiating for basketball, girls fast-pitch softball, and volleyball, earning $300 to $400 per month officiating. He also continues to generate income from his business, from which he estimated a monthly net profit of "maybe [$]400." Although Donald had earned as much as $45,000-$50,000 net profit from his business in the past, given the poor performance of the past number of years, he felt returning to teaching was his best option. It was Elizabeth's position that Donald could earn close to $50,000 as a teacher and doing "all the other stuff that he does."

Elizabeth testified the only way she was "making ends meet" was by withdrawing money from her inheritance to cover bills and living expenses. (Elizabeth inherited approximately $460,000; the nonmarital status of the inheritance is not at issue.) At the time of separation, Elizabeth testified that they had a marital debt totaling $146,592. Of this total, $112,332 (subsequently amended to $101,623), was for parent loans for their two older daughters' college education, $26,514 was for a debt consolidation loan, $6,774 was for a bank line of credit, and $1,371 was for a replacement furnace. All balances were determined as of the date of separation (February 2015). Elizabeth was ordered to pay and be solely responsible for all of these debts. Donald was initially ordered to pay and be responsible for $12,845.68 of the parties' bank line of credit; this was money he borrowed postseparation. However, in the order amending the decree, Donald's $12,845.68 debt was ordered to be paid by Elizabeth.

Having set forth the financial circumstances of the parties, we now consider the legal principles governing a court's decision with regard to alimony.

> In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.

> The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

*Wiedel v. Wiedel*, 300 Neb. 13, 20-21, 911 N.W.2d 582, 588-89 (2018). See, also, Neb. Rev. Stat. § 42-365 (Reissue 2016) (setting forth factors to consider and purpose of alimony award). The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017). Disparity in income or potential income may partially justify an award of alimony. *Hosack v. Hosack*, 267 Neb. 934, 678 N.W.2d 746 (2004).

However, while disparity of income may result in an alimony award, sometimes it does not. See *Becker v. Becker*, 20 Neb. App. 922, 934 N.W.2d 620 (2013) (22-year marriage, wife earned approximately $200,000 more than husband; husband did not forgo any employment or educational opportunities and did not need alimony to meet his monthly expenses; nevertheless, $2,000 per month alimony for 84 months awarded to husband not abuse of discretion). But see *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (court did not abuse its discretion by declining to award wife alimony; 20-year marriage and disparity of incomes favored award, but marriage did not interrupt wife's career or education, and no childcare duties hampered wife's career or educational pursuits after marriage).

In these types of cases we are limited by our standard of review. As previously stated, an appellate court does not consider whether it would have handled the alimony decision differently; rather, an appellate court should not disturb the trial court's alimony decision unless it is patently unfair on the record. See *Wiedel v. Wiedel, supra.* Based on the record before us, we cannot say the district court's decision on this issue was patently unfair.

As noted by the district court, Donald made the decision to change his career from teaching to sales early in the parties' marriage. He caused Elizabeth to interrupt her career by the moves to Nebraska, then Florida, and then back to Nebraska. There is evidence that Donald was able to net $45,000-$50,000 through his business in its earlier years, and with 22 years of sales experience, Donald should have opportunities for employment in this area should he decide to stay in sales. Further, he is also able to explore teaching opportunities since he completed his recertification in June 2016, and even Donald testified that his chances were going "to go much higher now that I'm

done, you know, as I look at the [2017-18] school year." Donald can also supplement his income with sports officiating, and while seeking full-time employment can earn $140 per day by substitute teaching.

Meanwhile, Elizabeth must take sole responsibility for nearly $150,000 in marital debt. And while Donald will contribute an almost equal share towards that debt through the equalization of the assets, as discussed later, this does not change the fact that Elizabeth must meet the month-to-month obligations due on that significant marital debt. This gives Donald the benefit of being able to move forward debt free. Further, there was no evidence of anything that would hinder Donald's ability to work on a full-time basis in sales and/or education, or to continue supplementing his income with sports officiating as desired or needed.

As in *Brozek v. Brozek, supra*, where no alimony was awarded to the wife despite the length of the marriage and the disparity of incomes, the district court in the present case focused similarly on the fact that the parties' marriage did not interrupt the husband's career or education, and further, given the age of the one remaining minor child, no childcare duties would hamper any career or educational pursuits for Donald after the divorce. Although the two years of temporary alimony was appropriate to allow Donald to take classes and be recertified in teaching, we cannot say that the district court abused its discretion in declining to award alimony to Donald at the time the decree was entered.

### DONALD'S CONTRIBUTIONS TO MARITAL DEBT

Donald alleges the district court credited Elizabeth for her contribution to the marital debt, but "completely ignored [his] contribution to said debt." Brief for appellant at 26. He claims he paid $6,157.37 towards the amended marital debt of $136,282.52. He claims the household bills ($1,812.37) were paid during the initial days after their separation and the bank payments ($4,345) were made in accordance with the temporary order. Therefore, he claims $6,157.37 "should be added to [his] portion of the retirement accounts." *Id*. at 27.

The amended marital debt figure of $136,282.52 was based upon the balances of the consolidation loan ($26,514), parent loans ($101,523), bank line of credit ($6,774.32), and debt on a replacement furnace ($1,371.20)--all determined at the time of the parties' separation in February 2015. The payments for which Donald is claiming credit were all made after the parties separated and are not relevant to the marital debt balances as of the date of separation. The allocation of assets was based on the debt existing as of the date of separation, not the debt that accrued or was paid for by the parties after separation. There was no error by the district court in disregarding postseparation debt payments or other expenses when determining the allocation of the marital assets and liabilities of the parties.

### RETIREMENT ACCOUNTS AND HANDLING OF MARITAL DEBT

We have consolidated several of Donald's assigned errors since they all relate to the way the district court handled allocating the marital debt. Donald asserts that each party is entitled to one-half of the marital retirement accounts, the total of which is $201,361.01. Therefore, he claims he should receive $100,680.50, without any reduction for his share of the marital debts. Donald says he "is 59 years old and would be virtually destitute without having at least half of the

retirement accounts," and his "age, income, and earning capacity prevent him from 'catching up' his retirement savings in order to retire in a few short years." Brief for appellant at 29.

Donald claims the "legal principles of reasonableness, fairness and the general equities of this case were not upheld by the district court," because the court assigned one-half the marital debt to him even though his income "is **less than one-fifth**" of Elizabeth's income. Brief for appellant at 28 (emphasis in original). He argues that since he does not have the money to pay half of the marital debt, the district court made him pay one-half "by subtracting that one[-]half from his portion of the marital retirement accounts," and by doing so, "the district court set in motion the inevitability of homelessness for [Donald] in his retirement years." *Id.* Donald asserts that ordering Elizabeth to be responsible for all of the children's student loan debt "would have been equitable due to her overall assets." Reply brief for appellant at 5. He claims it is wrong to force him to pay one-half the marital debt "by taking it from his portion of the marital retirement accounts." *Id.* at 30. He believes he is entitled to $100,680.50, plus all income accumulated from the time the complaint was filed.

Dissolution of marriage cases are equitable in nature, and the purpose of a property division is to distribute the marital assets equitably between the parties. See *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). The ultimate test for determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Id.* There is no mathematical formula by which property awards can be precisely determined. *Id.* In equity, there is rarely one tidy answer that fits every size and type of problem that courts are called upon to resolve. *Id.*

We agree with Elizabeth's response that Donald appears to be seeking "half of the marital assets but not be responsible for the marital debts." Brief for appellee at 21. Donald expects Elizabeth to be responsible for paying the entirety of the $136,282.52 in marital debts owed as of the date of separation, plus the $12,845.68 of additional line of credit debt Donald incurred after the separation (which included fees paid to his attorney), and then still give him one-half of the marital pension accounts. Based on Donald's trial testimony and arguments on appeal, it is evident that Donald is of the opinion that since Elizabeth has inherited substantial money and earns considerably more than him, then she should be responsible for absorbing the entirety of the debt incurred by the marriage as of the date of separation, as well as his personal postseparation debt, while equally sharing the pensions primarily earned through Elizabeth's employment. Notably, the district court only attributed to Donald the marital debt amount of $68,141.26, which is one-half of the marital debt up to the point of separation. No reduction was taken from Donald's share of the retirement funds for the additional $12,845.68 which Donald accrued postseparation through the line of credit, but which Elizabeth was ordered to pay when the decree was modified. In other words, Elizabeth was ordered to pay this amount without receiving any credit in the marital equalization, even though this debt included approximately $5,000 Donald paid towards his attorney fees and Donald's postseparation living expenses.

With the adjustments made in the amended decree, Donald's one-half interest ($100,680.50) of the total marital retirement accounts ($201,361.01) was reduced by his one-half share ($68,141.26) of the marital debt ($136,282.52 at the time of separation), leaving $32,539.24 owed to him as an equalization amount. According to the decree, this amount, plus all accumulated income or losses from March 1, 2016, will be allocated to him in Elizabeth's Edward Jones

Retirement Account. The retirement accounts were the only marital assets available to equalize the marital estate, other than the remaining contested proceeds from the sale of the house, which is discussed next. We find no abuse of discretion by the district court in determining the marital assets and liabilities should be equally shared, and by concluding that the most equitable way to apportion Donald's responsibility for his one-half share of the marital liabilities was by reducing his share of the assets in this manner.

TEMPORARY ORDER REGARDING MARITAL HOME

When the family home was sold, there were proceeds of $29,808.07, of which $15,421.41 was equally distributed to the parties, and $14,386.66 was held in escrow due to a dispute between the parties on how it should be apportioned. Elizabeth claimed entitlement to slightly over $11,000 for repairs made to the house to ready it for sale, plus she claimed $3,250 should be deducted from Donald's share since his refusal to accept an initial house offer caused this amount of loss upon accepting the next offer. Donald claimed Elizabeth should not be reimbursed for the house repair costs because she failed to consult with him prior to having the work done. Regarding his rejection of the first offer on the house, he explained that it was "humanly impossible to address it" on such short notice, and also, he was expecting multiple bids to get the price higher.

The court ordered $11,137.51 for repairs and improvements to the family home to be paid over to Elizabeth from the contested funds, with the balance then distributed equally between the parties. The court found Elizabeth did not violate the temporary order, as alleged by Donald; no deduction was made with regard to the $3,250 loss. We therefore address only Donald's argument related to the $11,137.51 allocated to Elizabeth before the equal distribution of the remaining house proceeds.

The temporary order entered on May 14, 2015, gave Elizabeth exclusive use and possession of the marital residence, and directed that the house be readied and listed for sale. The temporary order stated:

> All repairs or improvements needed for the house to be placed for sale shall be made by [Elizabeth] and she shall be reimbursed for all expenses she has incurred at the time of closing. [Elizabeth] shall consult with [Donald] and provide information on the improvements she intends to make but the final decision of the improvements shall be that of [Elizabeth]. [Elizabeth] shall provide receipts for said expenses.

Donald claims "[t]he court ignored [Elizabeth's] breaches of the Temporary Order" and "wrongfully" awarded her $11,137.51 of that amount. Brief for appellant at 31. Donald argues that the temporary order required Elizabeth to consult with him prior to making expenditures on the house, and that she did not do that; rather, she notified him after the work was completed. Donald testified, "Everything was on the aftermath. . . . No consultation, no reimbursement." He also claims Elizabeth only submitted receipts totaling $4,947.51, not $11,137.51 as she claimed, although he does not provide any point of reference in the record to support this argument. Exhibit 12 contains an itemization of repairs and costs dating from April 18 to June 29, 2015, totaling $11,137.51. Individual receipts/invoices are attached to the itemization.

According to Elizabeth, Donald knew what improvements needed to be made, and he agreed to them. "It was just a matter of who was doing the improvements." Elizabeth testified that

Donald was the one occupying the family home at the time the first realtor came over and had workers look at the house to put bids on the repair work needed to be done. But Donald said to put work on hold. According to Donald, the realtor "brought his people in. They were not my people. The bids . . . were not my bids." The realtor was "way too hands-on. He was telling me what colors to paint the walls of my house without any input from me."

The temporary order gave Elizabeth the final decisionmaking authority with regard to necessary repairs or improvements for the sale of the house. The language that Elizabeth was to consult with and provide information to Donald on intended improvements was satisfied by the information given to Donald by the initial realtor as to recommended repairs and improvements. The fact that Donald thought the realtor was "way too hands-on" is of no consequence. Elizabeth did not need to wait for Donald's consent in order to move forward with getting the house ready for sale. The temporary order authorized her to get the work done.

Donald also claims Elizabeth transferred marital property totaling $777 to the new homeowners, and this "breached the Temporary Order." *Id*. at 32. Donald "seeks restitution of the $777." *Id*. Elizabeth argues that "[n]owhere in the trial was this mentioned." Brief for appellee at 24. We agree that there is no mention in the record of $777 in property being transferred to the new homeowners. The first time it is referenced is in Donald's affidavit in support of his motion for new trial and motion to alter or amend; however, the affidavit does not refer to any testimony from trial, nor was such evidence located in this court's review of the record. An appellate court will not consider an issue on appeal that was not presented to or passed upon by the trial court, because a trial court cannot commit error in resolving an issue never presented and submitted to it for disposition. *Brown v. Jacobsen Land & Cattle Co.*, 297 Neb. 541, 900 N.W.2d 765 (2017).

FEDERAL CREDIT UNION ACCOUNT

Donald alleges Elizabeth had $2,409.65 in a federal credit union account, which she claimed was "all hers" since the account was only in her name. Donald asserts this is marital money and that the district court "failed to rule on this matter." Brief for appellant at 33. He says he is entitled to one-half that amount. Elizabeth claims this issue was not raised at trial, and therefore, there is no evidence in the record for this court to review.

However, Elizabeth was asked at trial how much money she had at a federal credit union at the time of separation. Her response was, "A couple thousand dollars maybe." She did not think she needed to divide that with Donald because "[i]t was in [her] name." She agreed that if the court decided to divide that account in half, she would abide by that decision.

The decree provides at paragraph 14 that "each party is awarded all right[,] title and interest to any cash, bank accounts, 401k's, or pensions funds that may be in their own names free and clear of any interest of the other, subject to the equalization provisions below." This provision would include Elizabeth being awarded her federal credit union account with "[a] couple thousand dollars maybe." Although it was not included in the marital equalization calculation, which would have increased Donald's share of the retirement funds by about $1,000, we also note that the district court did not include in the marital equalization the $12,845.68 debt Elizabeth was ordered to pay for Donald's postseparation debt. This would have reduced Donald's share of the retirement funds by more than $6,000. The district court did not abuse its discretion by awarding this account to Elizabeth and not factoring it into the marital equalization.

ATTORNEY FEES

Donald claims the district court abused its discretion by not awarding him attorney fees. He argues: Elizabeth filed for divorce "[o]ut of the blue," leaving him with "close to no funds"; Elizabeth's income is "at least five times greater" than his; and Elizabeth has significant resources, marital and nonmarital. Brief for appellant at 33-34. Donald suggests he will have to draw from "the miniscule portion of the retirement funds" to pay attorney fees, and that this court should award him $8,525 in attorney fees. *Id*. at 34. Donald testified at trial that the "grand total" of his attorney fees was $8,525, and the present balance due was $3,525.

Elizabeth argues that when the court amended the decree, she was ordered to pay a line of credit debt of $12,845.68, an amount which she claims includes $5,528.60 of Donald's attorney fees. Donald acknowledged taking these funds from the parties' line of credit, and using the money to pay $5,000 to his attorney and to cover his personal living expenses. The $5,000 payment is consistent with his testimony that of the $8,525 owed to his attorney, only $3,525 remained due. Therefore, Elizabeth is paying for $5,000 of Donald's attorney fees.

In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). In light of the amended order requiring Elizabeth to pay the additional line of credit debt which was incurred entirely by Donald, including the $5,000 payment made to his attorney, we cannot say the district court abused its discretion by declining to award additional attorney fees to Donald.

MINOR CHILD'S EXPENSES

Donald claims the district court should not have ordered him to "pay a portion of other expenses" for Emma outside medical and dental expenses "as a Worksheet 3 was not used by the court." Brief for appellant at 34. He says these "other expenses" are noted in paragraph 5 of the original decree. *Id*. That is the extent of Donald's argument.

Paragraph 5 of the decree states, in relevant part:

> That the parties shall divide any extracurricular activities or school fees incurred by the minor child. School fees shall include lunches, fees, school pictures, field trip fees, or any other expense reasonably necessary to the child's education. [Elizabeth] is responsible for 80%, [Donald] is responsible for 20%.

We assume that Donald's reference to "Worksheet 3" means the worksheet used for joint physical custody child support calculations and that he is suggesting that since this is not a joint physical custody case, the "other expenses" were not permissible. However, Neb. Rev. Stat. § 42-364.17 (Reissue 2016) provides:

> A decree of dissolution, legal separation, or order establishing paternity shall incorporate financial arrangements for each party's responsibility for reasonable and necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education, and other extraordinary expenses of the child and calculation of child support obligations.

While monthly child support payments are one incident of support for minor children, the Nebraska Child Support Guidelines recognize other incidents of support "that are wholly or partly outside of the monthly installment." *Caniglia v. Caniglia*, 285 Neb. 930, 934, 830 N.W.2d 207, 211 (2013). "The expenses stated in § 42-364.17--including, among others, extracurricular, education, and other extraordinary expenses--merely represent other incidents of 'support' to be addressed in a dissolution decree." *Caniglia v. Caniglia*, 285 Neb. at 934, 830 N.W.2d at 211. We find no abuse of discretion by the district court in dividing Emma's school-related expenses in proportion to the parties' incomes.

LEGAL CUSTODY

At the time of trial, Emma was a freshman in high school. The court awarded Elizabeth sole legal and physical custody of Emma. The decree states, in relevant part:

> Both [Elizabeth] and [Donald] are fit and proper persons to have the care, custody and control of the minor child. It is evident from the trial that the parties cannot effectively communicate with each other and it is in the best interests of the minor child for her legal and physical custody to be awarded to [Elizabeth], with [Donald] having parenting time as provided in the Parenting Plan, . . . [Donald's] claim of alienation by [Elizabeth] is unfounded. Any alienation of the child is a direct result of [Donald's] own behavior. [Donald's] controlling nature and repeated actions of refusal to [compromise] show [Donald] will not effectively participate in communication that considers the best interests of Emma.

The district court further stated the custody decision was "in the best interest of Emma who is a bright, mature fifteen year old."

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). The best interests inquiry has its foundation in both statutory and case law.

Neb. Rev. Stat. 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

> [T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member . . . ; and
>
> (e) Credible evidence of child abuse or neglect or domestic intimate partner abuse. . . .

- 11 -

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

Donald only challenges the award of sole legal custody to Elizabeth, arguing that the evidence supports joint legal custody. Donald's argument for joint legal custody is contained in four paragraphs, in which he asserts: he was the primary caretaker of the children; he was fully devoted to and involved in their lives; Elizabeth testified he was a good parent, and that he had been an active and involved parent; the temporary order granted joint legal custody; Elizabeth admitted to "breaking the Temporary Order regarding the legal custody issue of religious formation"; Elizabeth made decisions unilaterally without communicating with Donald; Elizabeth "testified to being incompetent as to what legal custody is"; the "court rewarded [Elizabeth] for multiple breaches of the Temporary Order by granting sole legal custody to [her]," Elizabeth testified that she and Donald "have had no conflict" such as schools, universities, and medical decisions; the "only significant legal custody issue" has involved religious formation for Emma; and "[d]espite [Donald's] deep concerns regarding the prejudicial stances of the church which the minor child attends, [he] has been powerless in prohibiting the minor child from attending that church." Brief for appellant at 34-35.

With regard to the religious disagreement that had developed, Donald testified about Emma's in camera statements to the judge on that issue. We note that Emma's in camera testimony was not offered into evidence, and that there was a stipulated protective order filed August 23, 2016, which states that a copy of the transcript of the minor child's in camera interview with the judge will not be given to either party, but that the details of the transcript may be shared with them. However, when Donald's attorney mentioned that Emma had talked with the judge, "and you've read the testimony," Donald's response was, "Yes." We take this to mean there must have been further agreement regarding the parents' access to the transcript of Emma's in camera testimony.

Donald explained that Emma likely mentioned the long arguments she was having with him at that time because her meeting with the judge was "quite recent to that time that I had long conversations with Emma about her radical new religious beliefs." Donald did go meet with members of Emma's church after finding out about her "radical new religious beliefs." He concluded that "it's not totally bad . . . but there's underlying stuff."

Elizabeth acknowledged that during the marriage, both she and Donald had been able to agree on some important decisions, such as sending their older daughters to expensive colleges, but it became "difficult to make decisions now that [they're] separated." In support of the court's decision to award her sole legal custody, Elizabeth points out that Donald's "controlling nature" and "unwillingness to compromise" is evident by the following: (1) Donald moved the family from Chicago to Omaha in 1993 because he wanted to be close to his family, and then Donald moved the family to Florida in 2004 because he did not like Omaha weather, but he moved the family back to Omaha by 2005 because the children missed their friends--all of these moves caused Elizabeth to lose benefits and seniority in her work; (2) the temporary order authorized Elizabeth to make repairs and improvements needed to sell the family home, but upon receiving the list of

such needs identified by the realtor, Donald said these required his authorization; (3) Donald refused to accept a full-price offer on the family home, claiming the 4- to 5- hour window to accept the offer was "impossible to meet," and when the acceptance time was extended to the next day, Donald again refused to accept the offer, saying it was "humanly impossible to accept"--Donald expected multiple offers to generate a bidding war for his property; (4) Donald's emails about or to his children "demonstrates the viciousness he responds to his own children when he does not get his way"; and (5) Donald testified he would not have deposited tax refunds and a university refund into the parties' joint account if he had known Elizabeth was filing for divorce--he would have put the funds into a different account so she "would not even know about the money." Brief for appellee at 28-30. Elizabeth claims Donald "only cares about himself," and "[h]e must be in control or he viciously attacks anyone that challenges his control." *Id*. at 30.

During trial, Elizabeth acknowledged that she had agreed to joint legal custody for the temporary order, but she now wanted sole legal custody "[b]ecause it is so difficult to make decisions" with Donald. "It's just very difficult to communicate with him. And even in minor issues with Emma, we can't find agreement." For example, Elizabeth testified that Donald said no to Emma going to Baltimore with Elizabeth to visit Elizabeth's brother, and he said no to Emma going to her youth group on Wednesdays. "[I]t's very difficult to get at small things so that's why I would prefer to have custody."

Exhibits of emails sent by Donald to Elizabeth, as well as their older daughters, were received without objection. Elizabeth characterized the emails as argumentative, and when it came to discussing the children, Donald was argumentative "[m]any times." Our review of the record supports Elizabeth's assertions, and also reveals Donald's angry emotional state and his attempt to influence his children against their mother and other family members. As an example, an email Donald sent to the oldest daughter in August 2015 criticizes Elizabeth, questioning why she has not paid off the daughter's student loans with her inheritance and stating that "it is utterly foolish and incredibly damaging to your future if your loans still exist today!" In the same email, Donald also cautions his oldest daughter that as she interacts with her grandparents, she "should be aware of the following[.]" What follows are pages of segmented thoughts apparently directed at Donald's parents; they reveal Donald's state of mind regarding the divorce and his family, and they offer a glimpse of Donald's anger and attitude.

Elizabeth did testify that she gets along well with Donald's parents and sees them on "a fairly regular basis." They live in the Omaha area and continue to see Elizabeth and Emma. On the other hand, according to Elizabeth, there was an incident in November 2007 which caused Donald "to cut off contact with his family," and "in general he prefers not to have any contact with his family." Elizabeth has a good relationship with Donald's family and intends to continue having Emma spend time with Donald's parents, as well as his other relatives.

It is unfortunate that Donald views his family as choosing sides, and the emails, along with the other evidence pointed out by Elizabeth, show that Donald was not in a state of mind to be able to share legal custody of Emma with Elizabeth. It is understandable that divorce can bring out the worst emotions in people, and it is also understandable that recovering from the termination of a lengthy marriage will take time. The evidence shows that both parents participated in raising their three daughters, and Elizabeth admits that Donald has been a good parent. However, the separation and divorce have been very difficult for Donald, and the record demonstrates that he and Elizabeth

would not be able to effectively communicate in making decisions regarding Emma. And where the parties are unable to communicate and trust one another, joint decisionmaking by the parents is not in the child's best interests. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, ___ N.W.2d ___ (2018). Therefore, on this record, we cannot say the district court abused its discretion in awarding sole legal custody to Elizabeth.

## CONCLUSION

For the reasons set forth above, the district court's decree, as amended, is affirmed.

AFFIRMED.